## EXHIBIT A

### AFFIDAVIT OF EUGENE M. DIFIORE

I, Eugene M. DiFiore, being duly sworn, depose and state as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been so employed for approximately nine years. I am currently assigned to the Logan Airport Task Force ("LATF") based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP") and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics using the resources of the participating law enforcement agencies.

2. Prior to my employment with the DEA, I was employed as a police officer with the Methuen Police Department in Methuen, Massachusetts from 1995 to 1999. I was also a police officer with the Amesbury Police Department in Amesbury, Massachusetts beginning in 1999 until I accepted a position as a criminal investigator with the DEA in 2005.

3. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials in both federal and state courts as a result of my involvement in those investigations. I have applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

4. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

      a.    $58,300 in United States currency seized from John McMahon on March 27, 2014 at Logan Airport, Boston, Massachusetts (the "Currency").

5.    This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

6.    This affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from the LATF, and my review of records and reports relating to the investigation.

7.    As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

**The Seizure of the Currency**

8.    On March 27, 2014, members of the LATF (collectively referred hereafter as "Investigators") received information regarding last minute travel arrangements made by John McMahon ("McMahon") on Virgin America Airlines. On March 25, 2014, McMahon purchased a round-trip ticket from Boston, Massachusetts to San Francisco, California, on flight number 537, scheduled to leave Boston at 7:44 p.m. less than two days later. He paid over $1,000 for his flight and was scheduled to fly standby.

9.    LATF agents are familiar with this particular flight to San Francisco because there have been multiple seizures of bulk currency made in Boston prior to the departure of the flight or

immediately upon arrival in San Francisco. These cases presented many common factors, including but not limited to the following: a) reservations for travel made within 48 hours prior to the departure date, b) reservations for one way tickets or roundtrip travel involving an immediate return back to Boston, c) flights purchased to and from a "source area" – or an area that is typically known to Investigators as a transit point where narcotics enters the United States or where narcotics, such as marijuana, is cultivated. Based on my training and experience, California has been a supply source of narcotics for Massachusetts, and the drug proceeds are transported back to California by mail or by airplane.

10. At approximately 4:25 p.m. on March 27, 2014, members of the LATF established surveillance and located McMahon, who was sitting in Terminal B adjacent to the gate area. McMahon checked two pieces of luggage, even though he was staying in California for less than 24 hours.

11. While SA O'Neill maintained surveillance of McMahon, I went to the outbound luggage belt to locate McMahon's suitcases, which were easily identified. I located two suitcases – one brown bag and one blue bag – both of which had baggage tags with McMahon's name. I removed the two bags from the baggage area and brought them to SA O'Neill's location to verify that McMahon owned the luggage.

12. SA O'Neill and I approached McMahon and identified ourselves as DEA Special Agents. SA O'Neill asked McMahon if he would consent to speak with us, and McMahon agreed. We asked McMahon about his travel arrangements. McMahon stated that he did not recall the exact price of his flight, but he confirmed that he paid approximately $1,000. He stated that he was on his way to California for a quick trip and that he intended to return the following day. SA O'Neill asked McMahon why he was traveling with two suitcases for a quick business trip, and

McMahon did not respond. Instead, he stated that he was traveling to San Francisco for "a business that's in the process of becoming legitimate." McMahon further stated "well, as a consultation – I mean consultant for marijuana. Medical marijuana." SA O'Neill asked if he had any documentation regarding medical marijuana, including prices, types of marijuana used for medical purposes, and related research. McMahon stated he did not have any information in his carry-on bag or in his luggage.

13.  SA O'Neill asked McMahon if he possessed items such as drugs, weapons, or bulk currency in any of his bags, and McMahon stated "Look I want to help, I'm just not sure of what I'm supposed to do." When asked if he packed his own suitcase or was asked by another person to transport or conceal items in the suitcases, McMahon stated that he packed both bags and that had not been approached by another person to transport items. He acknowledged having a small amount of money in one of the suitcases.

14.  SA O'Neill informed McMahon that agents were going to temporarily hold his luggage and have a drug detecting canine examine the luggage. SA O'Neill also told him that if the canine had a positive alert to the suitcases, Investigators would draft an affidavit and apply for a search warrant to search the suitcases. In response, McMahon expressed concern about missing his flight. Investigators asked McMahon to consent to a search of the luggage. McMahon stated "It's only money. That's not illegal." He stated that he had approximately $20,000 in his luggage and that it came from a "legitimate unknown source." When SA O'Neill asked McMahon to explain what he meant by "legitimate unknown source," McMahon did not respond. As I walked away from McMahon, I heard McMahon say "Oh my god. How did I get myself in this position." McMahon consented to a search of his luggage.

15. I then walked over to MSP Trooper John Hubbard ("Trooper Hubbard") and Sergeant Richard Galeazzi ("Sergeant Galeazzi") and informed them of the situation. Trooper Hubbard, MSP Sergeant Galeazzi, and I searched the suitcases. Trooper Hubbard and Sergeant Galeazzi located a large amount of money in a pair of black trousers in the brown suitcase. I located several separate bundles of currency in the blue suitcase. I found these bundles jammed in the center of a toilet paper roll, a paper town roll, men's shoes, within a pillow case, and in a cardboard Starbucks box. This currency was later counted and totaled $58,300 (*i.e.* the Currency).

16. SA O'Neill also conducted a search of McMahon's carry-on bag. SA O'Neill found a small notebook that contained entries that seemed to relate to the money found in the luggage. On one particular page, there was a handwritten note that said "count $ prepare & fold." On a different page, we discovered three crossed out entries – "Fold & prepare 2/," "Info on P.O. Box $35.00," and "check & collect $ from vase." SA O'Neill also founded a folded United States Postal Service receipt for a package shipped from West Wareham, Massachusetts dated March 26, 2014. The intended recipient was located in Phoenix, Arizona. The package was scheduled to be delivered on April 2, 2014. Based on my training and experience, Phoenix, Arizona is a source of supply of narcotics, including marijuana and crystal methamphetamines, and money may be sent via postal deliveries in furtherance of drug trafficking.

17. We also discovered additional handwritten notes in the notebook. There was a record in the notebook regarding two boxes that were shipped in the mail - one box containing $38,000 and another containing $29,000. There were also two handwritten notes – "$200.00 of the $29,000 – mine" and a separate entry "$2,200 paid by me." We also discovered what appeared to be a list of bills to be paid – "Seth 10K," "Darryl owes $2900," "Dave owes $100," and "Text Seth

about $ delivery." Based on my training and experience, these notes appear to be related to money utilized in furtherance of the purchase and sale of narcotics.

18. While Trooper Hubbard and Sergeant Galeazzi secured the Currency, I rejoined McMahon and SA O'Neill. McMahon asked if he could take his luggage and money and book a different flight. I told him that he could leave but that Currency would be subject to forfeiture proceedings. McMahon stated that the Currency came from his savings and was derived from income from his previous position at Papa Ginos, selling bicycles, and real estate. Although he claimed that he was renting a cottage to an unnamed tenant, he could not recall the city the cottage was located. Similarly, he also could not recall the name of the bicycle store at which he purported work. McMahon, then, refused to answer any additional questions.

19. Before we ended the conversation with McMahon, we asked McMahon to provide us with his home address and telephone number. We told him that the currency seized would be seized as suspected narcotics related proceeds and that he could receive a receipt for the seized Currency. He declined to provide a home address or telephone number, which was to be used to notify him of the seizure. McMahon further stated that he wanted all of his comments to be stricken from the record. McMahon chose not to continue his travel plans and was escorted out of Terminal B.

20. Sergeant Galeazzi transported the money back to the MSP Troop F barracks where a K-9 conducted a scan of the Currency.

21. MSP Trooper Brian McKenna ("Trooper McKenna") and his K-9 Drago are assigned to the LATF. Drago is a nine-year-old Belgium Malanois certified to the New England State Police Administrators Compact in K-9 standards. Trooper McKenna and Drago completed a 240 hour initial narcotics detection school in October 2006. Trooper McKenna and Drago train

continuously in narcotic detection two days per month. The training includes double blind testing and single blind searches whereby the location of the target item was known to the handler at the time of the search. Drago is certified in the detection of marijuana, cocaine, heroin, methamphetamines and is re-certified annually. Drago is also trained on uncirculated currency, which reinforces the K-9's alert to narcotics odors and not the currency itself. Trooper McKenna and Drago have conducted approximately 500 narcotics searches since 2006, which have yielded many successful detections of narcotic odors.

22.     Trooper Hubbard placed the seized Currency in a randomly selected location within the interior of a large garage bay at MSP Troop F Barracks, which contained lockers, storage bins, motor vehicles, and maritime equipment. Trooper McKenna arrived with his K-9 partner Drago and examined the surrounding area. Immediately thereafter, Drago executed the search and had a positive alert to the location where the Currency was hidden and to the Currency, indicating the presence of narcotics odor. Trooper Hubbard advised me and SA O'Neill of the results of the search. While Investigators were counting the money, I could smell the odor of marijuana. The Currency was then processed and secured.

**May 2014 Drug Arrest**

23.     As described in more detail below, less than two months later, McMahon was arrested and charged with operating a motor vehicle under the influence of narcotics, negligent operation of a motor vehicle, and possession of drugs with the intent to distribute, Class D. These charges are pending in Falmouth District Court. McMahon was also issued a traffic violation citation.

24.     On Wednesday, May 21, 2014, at approximately 5:00 p.m., MSP Trooper Russell Palenaude ("Trooper Palenaude") observed a vehicle traveling on Route 25 West in Bourne,

7

Massachusetts, at a slower rate compared to the other moving vehicles. The vehicle was travelling approximately 55-60 miles per hour in the right lane, and Trooper Palenaude observed several vehicles swerving around the vehicle. Trooper Palenaude also passed the vehicle and observed it swerving side to side, crossing both lanes of traffic multiple times. Trooper Palenaude pulled over into the break down lane to let the vehicle pass and then immediately pulled behind the car and activated the lights and siren to signal the car to stop. As Trooper Palenaude approached the vehicle, he detected an overwhelming odor of freshly burnt marijuana and fresh marijuana. In plain view were marijuana roaches and an open metal grinder in the center console area. The driver, identified as McMahon, admitted to smoking marijuana earlier that day with co-workers. Trooper Palenaude observed that McMahon had difficulty talking and he was unable to successfully pass the sobriety test, as his body was swaying in all different directions during the test. Based on Trooper Palenaude's training and experience, he believed McMahon was operating the vehicle under the influence of marijuana. Trooper Palenaude placed McMahon under arrest.

25. MSP Trooper Palenaude waited for back up to arrive prior to searching McMahon's vehicle. When additional officers arrived, Trooper Palenaude conducted a search of the vehicle and found the following additional items in McMahon's vehicle: a) one ounce bag of suspected marijuana in the center console, b) small bag containing seven packages of rolling papers, c) glass orange pipe containing suspected burnt marijuana, d) blue metal pipe with suspected burnt marijuana residue, e) blue gym bag which contained $57,820, f) digital scale, and g) a larger bag containing over three ounces of suspected marijuana. The currency and narcotics were seized and transported to District 7. The suspected marijuana was sent for lab analysis, the results of which are pending.

## Conclusion

26. Based upon the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. §881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the pains and penalties of perjury this 13th day of August 2014.

*[signature]*
Eugene M. DiFiore, Special Agent
United States Drug Enforcement Administration